# Termination of an Assistant United States Attorney on Grounds Related to His Acknowledged Homosexuality

An Assistant United States Attorney (AUSA), a federal employee in the "excepted" service, may not be terminated solely on the basis of his homosexuality, in the absence of a reasonable showing that his homosexuality has adversely affected his job performance.

The burden would be on the Department of Justice to demonstrate a nexus between the AUSA's homosexuality and an adverse effect on his job performance. In this case, it is doubtful whether the Department could meet its burden, because the AUSA has consistently received superior ratings and has been granted a security clearance. Although it may be argued that a prosecutor who violates a state criminal law prohibiting homosexual acts demonstrates a disrespect for the law inconsistent with the Department's standard of prosecutorial conduct, the Department would have difficulty establishing the required nexus as a matter of law, because the state law is only enforced against public conduct.

March 11, 1983

MEMORANDUM OPINION FOR THE ASSOCIATE ATTORNEY GENERAL

This responds to your request for advice on the legal implications of failing to retain an Assistant United States Attorney (AUSA) who is an acknowledged homosexual.

As set forth in more detail below, we have concluded that it would be permissible for the Department to refuse to retain an AUSA upon a determination that his homosexual conduct would, because it violates state criminal law, adversely affect his performance by calling into question his and, therefore, the Department's, commitment to upholding the law. We must advise, however, that the facts in this case are such that it would be very difficult under existing judicial decisions to prove that there is a nexus between his conduct and an adverse effect on job performance. Because the burden of proof would be on the Government to prove that such a nexus exists once the AUSA has established that he was dismissed for homosexual conduct, we would suggest consultations with the Civil Division and the Office of Personnel Management (OPM) before making a final decision not to retain a person under these circumstances. Both the Civil Division and OPM have informally expressed concern over our ability to defend successfully any suit that might be filed.

46

The AUSA in question has freely admitted his sexual preference, and that he has engaged in and intends to continue to engage in private consensual homosexual conduct. As we understand the facts, the only reason the Department would not retain the AUSA is because of his homosexual conduct, and that reason would, under the Department regulations, be reflected in the letter of termination. We also assume that the letter would note that homosexual acts are a crime under law of the state in which the AUSA is stationed, and that the Department believes that any such violations of local criminal law reflect adversely on the AUSA's fitness to represent the Government as a prosecutor.[1]

## I. Limitations on Terminating an AUSA

AUSAs are in what is known as the "excepted service." 5 U.S.C. § 2103(a). The Attorney General's authority to remove them, *see* 28 U.S.C. § 542(b),[2] is tempered, however, in several ways, two of which are relevant here: statute and OPM regulation.[3] The statute and regulation that protect AUSAs from prohibited personnel practices are 5 U.S.C. § 2302(b)(10) and OPM/FPM Supp. 731–1, subchap. 3–2(a)(3)(c).

---

[1] We do not address the constitutional validity of such laws. *Compare Baker* v. *Wade*, 553 F. Supp. 1121 (N.D. Tex. 1982); *People* v. *Onofre*, 415 N.E.2d 936 (N.Y. 1980), *cert. denied*, 451 U.S. 987 (1981); *Commonwealth* v *Bonadio*, 415 A.2d 47 (Pa. 1980); and *State* v *Pilcher*, 242 N.W.2d 348 (Iowa 1976) *with United States* v. *Lemons*, 697 F.2d 832 (8th Cir. 1983), *Doe* v. *Commonwealth's Attorney*, 403 F. Supp. 1199 (E.D. Va. 1975), *aff'd mem.*, 425 U.S. 901 (1976); and *Stewart* v. *United States*, 364 A.2d 1205 (D.C. Ct. App. 1976).

[2] The section states, "Each assistant United States Attorney is subject to removal by the Attorney General." There are no reported cases under this section. Department of Justice regulations provide that attorneys in the excepted service who are being removed are only entitled to a letter of termination. DOJ Order No. 1752.1A (Apr. 27, 1981). The Order states:

> GENERAL. The rights of excepted service employees are strictly limited when discipline, including separation, is to be imposed However, some service employees have the same protections as competitive service employees because of Veterans' Preference or prior competitive status.

> PROCESSING DISCIPLINE. a. An excepted service employee who is protected under law and the regulations of the Office of Personnel Management [because of veterans' preference] is entitled to the procedures [governing regular civil service employees].

> b. An excepted service employee with no protection under law or regulation should be given a letter advising him or her of the action being taken (suspension, separation, etc ) prior to the effective date of the action.

*Id.* at 19, 20.

[3] The limitations on the Attorney General's authority may be categorized as: (1) OPM regulations governing employment of those in the excepted service, *see* 5 C.F.R. §§ 302.101 *et seq.*; (2) statutes and OPM regulations governing employment of veterans in the excepted service; (3) Department regulations; and (4) any Department handbooks or informal understandings that may establish a reasonable expectation of continued employment. *See Ashton* v. *Civiletti*, 613 F 2d 923 (D C. Cir. 1979).

A veteran, 5 U.S.C. § 2108(1)(B), (3)(B), who has served for one year in the excepted service, *id* § 7511(a)(1)(B), is afforded civil service protection, and action may be taken against him "only for such cause as will promote the efficiency of the service." *Id.* § 7513(a). Whether the Attorney General's authority in 28 U.S.C. § 542(b) prevails over the veterans' preference statute is a question on which this Office expressed considerable doubt some years ago. Memorandum for William D. Ruckelshaus, Assistant Attorney General, Civil Division from Assistant Attorney General Rehnquist, Office of Legal Counsel (Sept. 10, 1970); Memorandum for Assistant Attorney General Rehnquist from Leon Ulman and Herman Marcuse (Sept. 4, 1970).

47

## A. *Statutory and Regulatory Constraints*

The decision not to retain the AUSA may be made for any number of reasons — for example, budget factors or employment ceilings — but it may not be made for a reason prohibited by statute or regulation. The Department is prohibited by statute

> from discriminat[ing] . . . against any employee or applicant for employment on the basis of conduct which does not adversely affect the performance of the employee or applicant or the performance of others.

5 U.S.C. § 2302(b)(10).[4] In addition, OPM has issued guidelines covering suitability for employment in the federal government.[5] Although applicants for employment in the excepted service may be disqualified if they engage in "infamous, . . . immoral or notoriously disgraceful conduct," 5 C.F.R. § 302.203, the courts have held that neither the status of being a homosexual nor homosexual conduct which does not adversely affect job performance falls within this provision. In reversing a decision by the Civil Service Commission (now OPM) to disqualify an applicant for employment because of alleged immoral conduct, the U.S. Court of Appeals for the District of Columbia Circuit said over fifteen years ago:

> The Commission may not rely on a determination of "immoral conduct," based only on such vague labels as "homosexual" and "homosexual conduct," as a ground for disqualifying appellant for Government employment.

*Scott* v. *Macy*, 349 F.2d 182, 185 (D.C. Cir. 1965).[6] As a result of cases such as this, *e.g., Norton* v. *Macy*, 417 F.2d 1161 (D.C. Cir. 1969); *Society for Individual Rights* v. *Hampton*, 63 F.R.D. 399 (N.D. Ca. 1973), *aff'd on other grounds*, 528 F.2d 905 (9th Cir. 1975); and *Baker* v. *Hampton*, 6 Empl. Prac. Dec. (CCH) ¶ 9043 (D.D.C. 1973), OPM issued a Bulletin on December 21, 1973, placing the following gloss on the regulation:

> [Y]ou may not find a person unsuitable for Federal employment merely because that person is a homosexual or has engaged in homosexual acts, nor may such exclusion be based on a conclusion that a homosexual person might bring the public service

---

[4] The statute covers appointments in the excepted service. 5 U.S.C. § 2302(a)(2)(A)(i), (B). AUSA positions do not fall within Schedule C, 5 C.F.R. § 213.3301, and are not, therefore, within any of the exceptions to the coverage of this statute. 5 U.S.C. § 2302(a)(2)(B)(i).

[5] OPM administers the regulations governing the civil service. 5 U.S.C. § 1103(a)(5) The civil service includes the excepted service. 5 U.S.C. § 2101(1).

[6] After the decision in *Scott*, the Civil Service Commission again disqualified the applicant, and was again reversed. *Scott* v. *Macy*, 402 F.2d 644 (D.C. Cir. 1968).

48

into public contempt. You, are, however, permitted to dismiss a person or find him or her unsuitable for Federal employment where the evidence establishes that such person's homosexual conduct affects job fitness — excluding from such consideration, however, unsubstantiated conclusions concerning possible embarrassment to the Federal Service.

*Ashton* v. *Civiletti*, 613 F.2d 923, 927 (D.C. Cir. 1980) (quoting Bulletin). In November 1975, OPM issued FPM Supplement 731–1, *Determining Suitability for Federal Employment.* Subchapter 3–2(a)(3)(c), which discusses infamous or notoriously disgraceful conduct, states:

Court decisions require that persons not be disqualified from Federal employment solely on the basis of homosexual conduct. OPM and agencies have been enjoined not to find a person unsuitable for Federal employment solely because that person is a homosexual or has engaged in homosexual acts. Based upon these court decisions and outstanding injunction[s], while a person may not be found unsuitable based on unsubstantiated conclusions concerning possible embarrassment to the Federal Service, a person may be dismissed or found unsuitable for Federal employment where the evidence establishes that such person's sexual conduct affects job fitness.

Thus, it is improper to deny employment to or to terminate anyone on the basis either of sexual preference or of conduct that does not adversely affect job performance. In short, there must be a reasonable showing that the homosexual conduct adversely affects the job performance.

*B. Case Law*

1. The Nexus Test

An examination of recent case law indicates that the burden is on the Government to demonstrate that the AUSA's homosexual conduct has adversely affected or will adversely affect his performance or that of others, and that it will be difficult for the Government to do so. *Hoska* v. *United States*, 677 F.2d 131, 136–38 (D.C. Cir. 1982). The U.S. Court of Appeals for the District of Columbia Circuit has articulated four ways in which homosexual conduct might adversely affect job performance: (1) if it jeopardizes the security of classified information through potential blackmail; (2) if it constitutes evidence of an unstable personality unsuited for certain kinds of work; (3) if it causes the employee to make offensive overtures at work; or (4) if it constitutes the basis of "notorious" activities that trigger negative reactions from fellow employees or the public. *Norton* v. *Macy*, 417 F.2d 1161, 1166 (D.C. Cir.

1969).[7] As in *Norton*, we believe that it be difficult for the Department to convince a court that the particular employee at issue failed any of these tests. *Id.* at 1166.[8] Given his record, it would appear that the only way his ability to function successfully might be jeopardized would be through hostility from the public or his fellow workers, but there is no evidence of any negative reactions. Nor is the AUSA, as an overt homosexual, apparently considered to be a security risk through a blackmail threat. The Department has given him a security clearance, and there is no evidence that the AUSA has an unstable personality: rather, his work is described as consistently superior. His current supervisor has stated that the AUSA's work continues to be excellent, and there are no allegations that he has made offensive overtures at work.[9] We are not aware of any evidence that he has engaged in the kind of notorious conduct that was found to be sufficient for termination in *Singer v. United States Civil Service Comm'n*, 530 F.2d 247 (9th Cir. 1976), *vacated and remanded*, 429 U.S. 1034 (1981), and *Childers v. Dallas Police Dep't*, 513 F. Supp. 134, 140–42 (N.D. Tex. 1981).[10] Rather, the AUSA has apparently been so discreet that the fact of his homosexuality came as a surprise to his superiors. Like the employee in *Norton*, the AUSA could successfully argue that he is a satisfactory worker who suffered an adverse employment action because of a general policy decision.[11]

---

[7] *Norton* involved a veteran who could only be dismissed for "such cause as will promote the efficiency of the service." 5 U.S.C. § 7512(a) (Supp 1965). The nexus test, however, has been carried over in subsequent cases to disputes involving those in the excepted service. *Ashton* v. *Civiletti*, 613 F.2d 923 (D.C. Cir. 1979). Not all circuits use the nexus test, *see, e.g., Vigil* v. *Post Office Dep't*, 406 F.2d 921 (10th Cir. 1969), but it is the test employed in the circuits in which it is most likely that the AUSA, if he were so inclined, would bring suit.

[8] *Norton* involved an otherwise competent NASA budget analyst dismissed because of a homosexual advance he made one evening while in a car. 417 F.2d at 1162–63. He was arrested for a traffic violation by members of the Morals Squad who had observed the incident. He was then interrogated about his conduct by the Morals Squad and NASA security officers. Although sodomy was a violation of the local law, D.C. Code § 22–3502 (1967), the court did not raise the issue of whether such a violation might automatically establish the nexus. The government's brief did, however, note that sodomy was a crime and that the police had probable cause to arrest Mr. Norton on that charge, although they chose not to. Appellee's Brief at 14 n.9, 31 & n.25, *Norton* v *Macy*, 417 F.2d 1161 (D.C. Cir. 1969). Thus, the Court of Appeals implicitly rejected the proposition that conduct violative of the local ordinance was sufficient, standing alone, to establish a nexus between the conduct and the job performance required in Mr. Norton's job.

[9] *See, e.g., Safransky* v. *State Personnel Board*, 215 N.W.2d 379, 381, 385 (Wisc. 1974).

[10] *Compare Singer*, 530 F.2d at 249, 252–55, *McConnell* v. *Anderson*, 451 F.2d 193 (8th Cir. 1971), *cert. denied*, 405 U.S. 1046 (1972); *Childers*, 513 F. Supp. at 140–41 *with Aumiller* v. *University of Delaware*, 434 F. Supp. 1273 (D. Del. 1977). *See also Ross* v. *Springfield School Dist. No. 19*, 641 P.2d 600, 608 (Or. Ct. App. 1982) (teacher properly dismissed where public practice of homosexuality resulted in "notoriety" which impaired his teaching ability).

[11] In *ben Shalom* v. *Secretary of Army*, 489 F. Supp. 964 (E.D. Wisc. 1980), the court found that the dismissal of an otherwise suitable soldier because of her homosexuality violated the soldier's substantive due process rights under the Fifth Amendment. *Id.* Given that the soldier had received high marks on her military performance, the court found that there was no nexus between her status as homosexual and her suitability for service. "It was, therefore, arbitrary, capricious and unreasonable for the Army to conclude that the petitioner was anything other than a 'suitable' soldier under its regulations." *Id.* at 977. *See also Martinez* v. *Brown*, 449 F. Supp. 207 (N.D. Ca. 1978) (same; Navy regulations). *But see Beller* v. *Middendorf*, 632 F.2d 788 (9th Cir.) (rejecting same analysis when applied to Navy regulation), *pet'n for reh'g en banc denied sub nom. Miller* v. *Rumsfeld*, 647 F.2d 80 (9th Cir. 1980), *cert. denied*, 452 U.S. 905 (1981). The denial of the petition for rehearing *en banc* elicited a long dissent. *Miller*, 647 F.2d at 80–90.

We are aware of two cases in which the Government has dismissed homosexual employees and defended the dismissals successfully: *Singer, supra*, and *Dew* v. *Halaby*, 317 F.2d 582 (D.C. Cir. 1963), *cert. dismissed*, 379 U.S. 951 (1964). *Dew* occurred prior to the issuance of the pertinent OPM regulation. *Singer* involved the kind of "notorious" conduct faulted in *Norton*: Mr. Singer was a clerk typist whose work was satisfactory but whose off-duty conduct included kissing and embracing another man on federal property, discussing gay rights on TV shows in which he identified himself as a federal employee, applying for a marriage license to be married to another man, and receiving "extensive" publicity because of his attempt to obtain a marriage license. 530 F.2d at 249. In both *Dew* and *Singer*, the Government received adverse publicity because of the dismissals and eventually reversed its policy, reinstating both employees with back pay.

Because the AUSA has stated that he intends to continue to engage in homosexual conduct, and this is now public knowledge, the Department might take the position that an AUSA who habitually engaged in a violation of state criminal law brings discredit upon the Department sufficient to establish the kind of nexus required by current case law. We could argue that the willingness to engage in such acts in violation of local law demonstrates a disrespect for the law that is not consistent with the standard of conduct demanded by the Department of someone who is engaged in prosecuting others for violations of the law. We could also note that the local legal community, represented by the state bar, has condemned at least the public practice of homosexuality.

On the other hand, OPM's regulation forbids the federal government from discriminating against those who engage in homosexual conduct, absent a nexus between the conduct and job performance. The AUSA could argue that OPM's regulation forbids the taking into account of state laws, especially if the AUSA would probably not be prosecuted for private consensual homosexual acts under the state's current enforcement policy. OPM was presumably aware in 1973 that homosexuality violated the laws of many states and did not intend its standard an adverse effect on job performance to be met by merely showing that the conduct violates state law.

## 2. Law Enforcement Exception

The only justification in the case law which might support a decision to refuse to retain the AUSA in this context would be to convince the court that private homosexual conduct is, once it is public knowledge, detrimental to the performance of the AUSA's job in states where it violates the criminal law. Proving the nexus between questioned behavior and job performance, especially when the behavior occurs outside the work place, is, however, often difficult.[12] Courts seem reluctant to find a nexus if the behavior does not occur

---

[12] *See Bonet* v. *United States Postal Service*, 661 F.2d 1071 (5th Cir. 1981) (indictment for child molestation, standing alone, insufficient); *Young* v. *Hampton*, 568 F.2d 1253 (7th Cir. 1977) (conviction for drug use,

Continued

during official work hours, and have stated that it is the agency's obligation to spell out how the conduct will affect performance or promote the efficiency of the service. *Phillips* v. *Bergland*, 586 F.2d 1007, 1012–13 (4th Cir. 1978).

The most effective way to prove adverse effect on job performance would be to prove that the special nature of a prosecutor's job — his public representation of the entire Department, his duty to uphold the law, and the potential for accusations of hypocrisy for hiring a lawbreaker to enforce the law — requires that there be no taint of criminality. 28 C.F.R. § 45.735–2(a). Some cases have emphasized that law enforcement officers can, because of their particularly sensitive positions, be held to a stricter standard of behavior, even in their private lives, than might otherwise be the case. For example, in *Masino* v. *United States*, 589 F.2d 1048 (Ct. Cl. 1978), the court approved the dismissal of a United States customs officer because of his voluntary statements that he had smoked marijuana on several occasions:

> Masino in his position as a Customs Inspector was specifically charged with enforcing the laws concerning contraband, including marijuana. Since possession and/or use of marijuana is a violation of federal criminal statutes, he was clearly not conducting himself in a manner to be expected of a Government employee engaged in law enforcement duties. This was what the appeals authority said, and we agree. Further, in addition to the language of the appeals authority, the transportation and use of the very contraband which a law enforcement officer is sworn to interdict, is clearly misconduct which "speaks for itself." Obviously, the disciplinary action of termination taken against Masino to "promote the efficiency of the service" cannot be said to be without a rational basis. His discharge was neither arbitrary nor capricious.

589 F.2d at 1056. A district court has upheld a state law barring all felons, even those who had received pardons, from being policemen. *Dixon* v. *McMullen*,

---

[12]( . . . continued)

standing alone, insufficient); *Tygrett* v. *Barry*, 627 F.2d 1279 (D.C. Cir. 1980) (reaffirming analysis in *Tygrett* v. *Washington*, 543 F.2d 840 (D C. Cir. 1974)) (probationary policeman's advocacy of illegal "sick out" insufficient); *Grebosz* v. *United States Civil Service Comm'n*, 472 F. Supp. 1081 (S D.N.Y. 1979) (convictions for possession of marijuana and sale of cocaine insufficient). Even questionable conduct while at work does not automatically provide the nexus. In *Phillips* v. *Bergland*, 586 F.2d 1007 (4th Cir. 1978), the court declined to find that assaulting a fellow employee in the stairwell, albeit during the lunch hour, was facially sufficient to prove the nexus:

> Typical of conduct, which carries on its face prejudice to the service as contemplated in § 7501(a), are falsification of work records or expense accounts, theft of government property, assault on one's supervisor at work, and insubordination. All of these . . . are quite different from misconduct which is entirely unrelated to the employee's work and which occurs when the employee is off duty. And the courts have recognized that distinction and have made plain the greater burden which rests on the agency to justify its action in the latter case.

*Id.* at 1011 (footnotes and citations omitted). *But see Yacovone* v. *Bolger*, 645 F 2d 1028 (D.C. Cir.), *cert denied*, 454 U.S. 844 (1981) ($8 theft by Postmaster sufficient because of fiduciary responsibilities); *Wathen* v. *United States*, 527 F.2d 1191 (Ct. Cl.) (murder committed in public sufficient), *cert. denied*, 429 U.S. 821 (1976); *Gueroy* v. *Hampton*, 510 F.2d 1222 (D.C Cir 1974) (manslaughter conviction sufficient).

527 F. Supp. 715 (N.D. Tex. 1981). The court said that it was permissible for the state to examine the individual's prior history and to deny employment to those with a background of lawbreaking in order to insure "that those persons publicly employed in emergency or dangerous situations are sober and alert, and possess qualities such as honesty, integrity, reliability and obedience to the law." *Id.* at 721. Noting that policemen are acting on behalf of "people at large," the court said:

> Policemen are just simply a special category. Integrity and trust are prerequisites. The law clothes an officer with authority to handle many critical situations, including those that occur in a lightning moment and which can never be reenacted or reversed. . . . A state's legitimate concern for maintaining high standards of professional conduct extends far beyond the initial licensing.

*Id. See also Upshaw* v. *McNamara*, 435 F.2d 1188, 1190 (1st Cir. 1970); *Macchi* v. *Waley*, 586 S.W.2d 70, 72–74 (Mo. Ct. App. 1979); *Vegas* v. *Schechter*, 178 N.Y.S.2d 67, 68–69 (Sup. Ct. 1958).[13] Even those whose connections to law enforcement appear more tenuous have come within the sweep of these statements. In upholding the denial of employment to a homosexual who sought work as a property room clerk in the police department, *Childers* v. *Dallas Police Department, supra,* the court said:

> No one can disagree that the character and activities of those to whom we entrust the enforcement of our laws must be beyond reproach. The activities of an employee of a law enforcement agency are of paramount interest to that agency, as the police department as a whole must reflect the values of a majority of society.

*Childers,* 513 F. Supp. at 140–41.[14] Likewise, it could certainly be argued that public prosecutors must be trustworthy and law abiding, or else the public's confidence in the justice system will erode. Persons deciding whether to bring or decline prosecutions should not be lawbreakers themselves.[15]

---

[13] *But see Smith* v. *Fussenich,* 440 F. Supp. 1077 (D. Conn. 1977) (law barring all felons from work as private security guards struck down as overbroad).

[14] However, *Childers* offers less support for the decision not to retain the AUSA than at first appears. First, the case involved a property room clerk, the same kind of low-level job involved in *Ashton, supra,* in which the D.C. Circuit came to the opposite conclusion about an FBI mailroom clerk. Second, *Childers* involved a homosexual who, as in *Singer,* was not discreet and who openly advocated homosexuality while identifying himself as a public employee. The notoriety led the Court to conclude that the applicant failed one of the tests laid out in *Norton, supra. Childers,* 513 F. Supp. at 142 n.11.

[15] Law enforcement is not the only profession the courts have recognized as being one in which the public's confidence in the employee is important. An air controller's job has been described by courts as a "a sensitive one" in which misconduct may erode the public's faith in reliability of the national air control system. *Dew* v. *Halaby,* 317 F 2d 582, 587 n.11 (D.C Cir. 1963) (homosexual acts), *cert. dismissed,* 379 U.S. 951 (1964); *McDowell* v. *Goldschmidt,* 498 F. Supp. 598, 605 (D. Conn 1980) (conviction for possession of marijuana). *Dew*'s continued validity has been undercut by *Norton,* decided five years later, in which the D.C. Circuit was much more willing to question and overrule OPM's rationale.

We must emphasize, however, that none of these cases is dispositive. Furthermore, the fact that the AUSA has apparently, according to those who have evaluated him, continued to perform effectively in his job even after his homosexuality became public knowledge in the United States Attorney's Office will seriously undercut the crucial argument that his homosexual conduct is adversely affecting his job performance. In order to prevail, the Department may well have to convince the courts to accept the argument that the continuing violation of local laws that make private consensual homosexual conduct criminal establishes the required nexus as a matter of law even though that local law probably would not be enforced against the AUSA and even though such a legal "presumption" might be said to run counter to the pertinent statute and regulations.

## II. Constitutional Protections

The AUSA might attempt to argue that failing to retain him would violate certain of his constitutional rights, but we do not believe such arguments would be successful. It is true that federal employees do not give up their constitutional rights upon accepting employment and the federal government may not condition a job upon the waiver of those rights. However, the issue whether the right to privacy, which the courts have determined to be protected by the Constitution, encompasses the right to practice private consensual homosexuality is still a matter of serious dispute. *See Berg* v. *Claytor*, 436 F. Supp. 76, 79 (D.D.C. 1977), *vacated*, 591 F.2d 849 (D.C. Cir. 1978). Although some courts have found protection for homosexuals for certain activities in the First Amendment either in the freedom to speak,[16] the freedom to associate,[17] or the right to

---

[16] *See Aumillier* v. *University of Delaware*, 434 F. Supp. 1273, 1311 12 (D. Del. 1977); *Acanfora* v *Bd. of Education*, 491 F.2d 498, 501 (4th Cir.), *cert. denied*, 419 U.S. 836 (1974). In *Aumillier*, the court awarded punitive damages in an action brought under 42 U.S.C. § 1983 against a university president who refused to rehire an untenured teacher because the teacher had discussed his homosexuality in public. *But see Suddarth* v. *Slane*, 539 F. Supp. 612, 616 (W.D. Va. 1982) (denied recovery under § 1983 on ground that participation in illegal act — adultery — precluded recovery for allegedly wrongful dismissal). Damages were also awarded in *Johnson* v. *San Jacinto Junior College*, 498 F. Supp. 555, 577 79 (S.D. Tex. 1980) (adultery punished by summary demotion without a hearing).

[17] *See Gay Lib* v. *University of Missouri*, 558 F.2d 848 (8th Cir. 1977) (freedom of speech and association protects homosexual students), *cert denied*, 434 U.S. 1080 (1978); *Gay Alliance* v. *Mathews*, 544 F.2d 162 (4th Cir. 1976) (same); *Gay Students Org.* v. *Bonner*, 509 F.2d 652 (1st Cir. 1974) (same); *Lesbian/Gay Freedom Day Committee, Inc.* v. *INS*, 541 F Supp 569 (N.D. Cal. 1982) (holding unconstitutional *per se* exclusion of homosexual aliens as violative of First Amendment associational rights of homosexual citizens); *Fricke* v. *Lynch*, 491 F. Supp. 381 (D.R.I. 1980) (homosexual high school student's rights to freedom of speech and association covered bringing homosexual date to high school prom); *Student Coalition for Gay Rights* v. *Austin Peay State University*, 477 F Supp. 1267 (M.D. Tenn. 1979); *Toward a Gayer Bicentennial Committee* v. *Rhode Island Bicentennial Foundation*, 417 F. Supp. 632 (D.R.I. 1976) (upholding right of access to public forum); *Gay Activists Alliance* v. *Board of Regents*, 638 P.2d 1116 (Okla. 1981); *Alaska Gay Coalition* v. *Sullivan*, 578 P.2d 951 (Ala. 1978). *See also Nemetz* v. *INS*, 647 F.2d 432 (4th Cir. 1981) (private homosexual conduct does not preclude finding of "good moral character" necessary for naturalization). Even the military's *per se* exclusion of homosexuals has been successfully attacked in some cases despite the traditional deference given to arguments about discipline and upholding the law. *ben Shalom* v. *Secretary of Army*, 489 F. Supp. 964 (E.D. Wisc 1980) (discharge for homosexuality violated rights of association and personal privacy). *See also Bruns* v. *Pomerleau*, 319 F. Supp. 58 (D. Md. 1970) (refusal to accept employment application from practicing nudist violated his right to freedom of association). Some courts have also found protection in state constitutions. *Gay Law Students Ass'n* v. *Pacific Tel. & Tel.*, 595 P.2d 592, 597 (Cal. 1979)

conduct one's private life free from government surveillance, *see Cyr v. Walls*, 439 F. Supp. 697 (N.D. Tex. 1977) (police surveillance of homosexual groups violated right to privacy),[18] we do not believe that failing to retain the AUSA would violate these rights. The Department has not invaded the AUSA's privacy by making impermissible inquiries, because the background check is required of all applicants and there has been no further inquiry. Failure to retain the AUSA would not be because he associates with homosexuals or has spoken out about his status but solely because of a determination that knowing, continuing violations of a local criminal law are sufficient to disqualify him from a job as a federal prosecutor.

### III. Conclusion

The Department has the right to decline to retain the AUSA if his conduct or intended conduct are adversely affecting his job performance or the performance of those around him. In this particular case, the individual involved apparently has an excellent record as a litigator and is, according to his present superior, functioning in a satisfactory manner. It would be difficult, given this record, to show that his homosexual conduct in fact adversely affects his job performance. Rather, we believe that on these facts it would be likely that he would meet the tests articulated in *Norton, supra*, especially in view of the fact that the Department is willing to give him the security clearance necessary for his work. The state criminal law he is apparently violating is, we understand, only enforced against public conduct. The Department does not have a policy of dismissing people for conduct that violates other similar state criminal laws.

Staff members at both the Civil Division, which will be called upon to defend any suit, and OPM, whose regulation we are interpreting, have been informally consulted and have stated that they believe the facts of this case will make it difficult to establish a sufficient nexus between the conduct and the job performance, and we tend to agree with their judgment. As long as the OPM regulation remains in force, we also believe it would be difficult to establish the proposition that the violation of local laws on the facts of this case establishes a nexus as a matter of law sufficient to support a decision to dismiss.

We must reiterate that the case law makes it clear that potential embarrassment to the Department is not enough to justify a refusal to retain an AUSA: there must be a supportable judgment made by the appropriate officials that the AUSA's actions are adversely affecting his performance. Unless the Department can reasonably expect to maintain the burden of proof on this issue, it is

---

[18] *See also Shuman* v. *City of Philadelphia*, 470 F. Supp. 449, 459 (E.D. Pa 1979) (inquiry into off-duty personal activities — affair with an 18-year-old — violated right of privacy in the absence of any showing of impact on job performance); *Major* v. *Hampton*, 413 F. Supp. 66 (E.D. La. 1976) (dismissal of IRS officer who rented apartment for off-duty, extramarital affairs impermissible); *Mindel* v. *United States Civil Service Comm'n*, 312 F. Supp. 485 (N.D. Cal. 1970) (termination of postal clerk for cohabiting violated Ninth Amendment right to privacy). *But see Suddarth* v. *Slane*, 539 F. Supp 612 (W.D. Va. 1982) (adultery not protected by the First Amendment); *Hollenbaugh* v. *Carnegie Free Library*, 436 F. Supp. 1328 (W.D. Pa. 1977), *aff'd*, 578 F.2d 1374 (3d Cir.) (employees' open adultery not protected by right of privacy), *cert. denied*, 439 U.S. 1052 (1978).

not reasonable to expect that the Department would prevail. Without stronger evidence that this particular individual's homosexuality is adversely affecting his performance, we believe that it would be difficult to overcome charges of discrimination on the basis of conduct that apparently does not adversely affect the performance of the employee or those around him.

THEODORE B. OLSON
*Assistant Attorney General*
*Office of Legal Counsel*
